# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC ASIAN ENTERPRISES, a California corporation, and RLI Insurance Company, an Illinois corporation,<br><br>                                    Plaintiffs,<br>   vs.<br><br>CROSS CHARTERING N.V., a foreign limited liability company, *in personam*; SSA MARINE, INC., a Washington corporation doing business as STEVEDORE SERVICES OF AMERICA; and M.V. CATALONIA V-285, her machinery, tackle, and engines, etc., *in rem*;<br><br>                                    Defendants | CASE NO. 10cv1335-LAB (WVG)<br><br>**ORDER ON DEFENDANTS' MOTION TO DISMISS** |

    The facts of this case are straightforward. Plaintiff Pacific Asian Enterprises, based in Dana Point, California, designs and sells yachts. It contracts with a Taiwanese shipbuilder to actually build them, and the finished yachts are shipped from Taiwan to various locations worldwide. Defendant Cross Chartering is a "carrier" that charters and sells space on cargo ships. As the carrier, it issues a "bill of lading" to the shipper, which is basically a commercial shipping contract. Defendant Stevedore Services of America is, as its name suggests, a stevedore. It unloads cargo from cargo ships when they arrive at their destination; it is hired by the carrier.

On June 4, 2009, PAE shipped one of its yachts, a "Nordhavn Motor Sailer" from Kaohsiung, Taiwan to San Diego. Cross Chartering arranged for the Nordhavn to be shipped on board the M.V. Catalonia, a Maltese cargo ship that is also a Defendant in this case but was apparently never served. When the Catalonia arrived in San Diego on June 27, 2009 SSA employees attempted to unload the Nordhavn from the ship with a pair of cranes. Somehow, they dropped the Nordhavn and she sank.[1] PAE was out $1,826,777.86. Its insurer RLI Insurance covered the loss, and now RLI is asserting a subrogation claim for roughly that amount against Cross Chartering and SSA.

The only issue now before the Court is whether this case can proceed in San Diego, where PAE filed it, or whether a forum clause in the bill of lading that Cross Chartering issued to PAE controls. That forum selection clause provides for all disputes arising out of the shipment of the Nordhavn to be resolved "where the Carrier has his principal place of business." Cross Chartering's principal place of business is Antwerp, Belgium.

## I.     The Bill of Lading

The parties have jointly submitted to the Court a copy of the bill of lading at issue that they agree is authentic and admissible. (Doc. No. 24.) It is two pages.

The first page (or front page) contains the vital details of the shipping agreement: who the shipper is, who the receiver is, the name of the cargo vessel, the cost of the shipment, and so forth. The cargo is described as "ONE NORDHAVEN 56 MOTOR SAILER, HULL NO. 5." Just below this description are the words "CARRIED ON DECK WITH MERCHANTS' CONSENT AND AT THEIR RISK AS TO PERILS INHERENT IN SUCH CARRIAGE WITHOUT LIABILITY AND OR RESPONSIBILITY TO THE VESSEL OR CARRIER BUT IN ALL OTHER RESPECTS SUBJECT TO THE PROVISIONS OF THE

//

//

---

[1] SSA's reply brief reveals that PAE actually shipped two yachts, only the second of which was dropped and lost. (SSA Reply Br. at 8 ("In the instant case, it is undisputed that the first yacht was discharged safely. The second yacht was dropped from the slings when the crane drivers got out of sync.").)

UNITED STATES CARRIAGE OF GOODS BY SEA ACT 1936." The declared value of the Nordhavn is "NONE."[2]

The second page of the bill of lading contains the fine print, that is, the legal terms of the shipping contract.[3] For the purposes of the present dispute, there are four pertinent provisions. The first is the forum selection clause:

> **4.    Law and Jurisdiction.**  Disputes arising out of or in connection with this Bill of Lading shall be exclusively determined by the courts and in accordance with the law of the place where the Carrier has his principal place of business, as stated on Page 1, except as provided elsewhere herein.

The second and third pertinent provisions relate to liability.

> **3.    Liability for Carriage Between Port of Loading and Port of Discharge.**  The Carrier shall in no case be responsible for loss of damage to cargo arising prior to loading, after discharging, or with respect to deck cargo and live animals.
>
> **15.    Defences and Limits of Liability for the Carrier, Servants and Agents.**  It is hereby expressly agreed that no servant or agent of the Carrier (which for the purpose of this Clause includes every independent contractor from time to time employed by the Carrier) shall in any circumstances whatsoever be under any liability whatsoever to the Merchant under this Contract of carriage for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part while acting in the course of or in connection with his employment.

The fourth clause speaks to the application of COGSA:

> ADDITIONAL CLAUSE

---

[2] PAE argues in its opposition brief that "CC, an obviously very experienced carrier, failed to comply with even the minimal requirement of stating its principal place of business on the front of its own BOL . . . ." (Opp'n Br. at 5.) This seems wrong to the Court. On the bottom left of the first page of the bill of lading, Cross Chartering is identified as an Antwerp company. Antwerp is not identified in the actual box on the bill of lading that calls for the carrier's principal place of business, but it *is* identified less than an inch beneath that box. Moreover, the parties' previous commercial dealings leave room for no reasonable doubt on PAE's part as to where Cross Chartering's principal place of business is.

[3] The bill of lading that the parties jointly submitted is blurry in spots and hard to read. The declaration of Christophe Thienpont attached to Cross Chartering's motion to dismiss also contains a copy of the bill of lading that is much easier to read (and apparently identical). (Doc. No. 22-7, Ex. A-7.) The Court will go off of it.

    U.S. Trade.  Period of Responsibility

    (I) In case the Contract evidenced by this Bill of Lading is subject to the Carriage of Goods by Sea Act of the United States of America, 1936 (U.S. COGSA), then the provisions stated in said Act shall govern before loading and after discharge and throughout the entire time the cargo is in the Carrier's custody and in which event freight shall be payable on the cargo coming into the Carrier's custody.

    (ii) If the U.S. COGSA applies, and unless the nature and value of the cargo has been declared by the shipper before the cargo has been handed over to the Carrier and inserted in this Bill of Lading, the Carrier shall in no event be or become liable for any loss or damage to the cargo in an amount exceeding USD 500 per package or customary freight unit.

There are, of course, other provisions in the bill of lading, but these are the ones that are relevant to the parties' dispute.

## II. PAE's Position

PAE, drawing on the Supreme Court's decision in *Vimar Seguros v. M/V Sky Reefer*, 515 U.S. 528 (1995), argues that the forum clause is against public policy and therefore unenforceable because it will not be able to vindicate its rights under United States law in a Belgian court.  Specifically, the argument is that a Belgian court will enforce provisions (3) and (15) in the bill of lading, which will eradicate the liability of Cross Chartering and SSA in a manner prohibited by the Carriage of Goods by Sea Act (COGSA).  It also argues that a Belgian court will not recognize a "fair opportunity" defense — which is recognized in the United States — to strictly enforcing the bill of lading's terms.

COGSA prohibits bills of lading from limiting liability for negligence:

    Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect.

46 U.S.C. § 30701, Note, § 3(8).[4]  This is very similar to the language of COGSA § 30704:

    A carrier may not insert in a bill of lading or shipping document

---

[4] COGSA was previously (and at the time *Vimar Seguros* was decided) codified at 46 U.S.C. § 1300 *et seq.*  Then, this provision was a standalone provision, codified at 46 U.S.C. § 1303(8).

>a provision avoiding its liability for loss or damage arising from negligence or fault in loading, stowage, custody, care, or proper delivery. Any such provision is void.

The Court will address these two arguments in sequence.

### III.     Legal Standard

First, though, it's important to emphasize that, following *Vimar Seguros*, the relevant question is *not* whether a Belgian court will apply United States law in the same manner that a United States court would, but "whether the substantive law to be applied will reduce the carrier's obligations to the cargo owner below what COGSA guarantees." *Fireman's Fund Ins. Co. v. M.V. DSR Atlantic*, 131 F.3d 1336, 1339 (quoting *Vimar Seguros*, 515 U.S. at 538). *See also Heli-Lift Ltd. v. M/V OOCL Faith*, 2001 WL 34084370 at *5 (C.D. Cal. Dec. 11, 2001) ("[T]he Court concludes that it must compare the substantive obligations of a carrier under German law with a proper construction of COGSA, to determine whether application of German law would lessen the carrier's liability to the shipper.") (internal quotations omitted). Thus, to the extent PAE's argues that the forum clause in the bill of lading is unenforceable because a Belgian court will not apply United States law, it is misguided.[5]

Even if PAE can establish that a Belgian court will diminish their recovery, or apply COGSA differently from the way this Court would, that is insufficient to justify this Court's continuing jurisdiction. See *Vimar Seguros*, 515 U.S. at 541 ("[M]ere speculation that the foreign arbitrators might apply Japanese law which, depending on the proper construction of COGSA, might reduce the respondents' legal obligations, does not in and of itself lessen liability under COGSA § 3(8)."); *PAC Global Ins. Brokerage, Inc. v. Gramter Int'l*, 2007 WL 5557304 at *5 (C.D. Cal. Sept. 21, 2007) ("[A] potential reduction in monetary damages is not tantamount to a reduction of Defendants' substantive obligations.").

---

[5] Cross Chartering and SSA rely on the Supreme Court's holding in *M/S Bremen v. Zapata Off-Shore Co.* that a forum clause must be enforced unless "the contractual forum will be so gravely difficult and inconvenient that [a party] will for all practical purposes be deprived of [its] day in court." 407 U.S. 1, 18–19 (1972). As the Court reads this holding, however, it speaks to the invalidation of a forum clause on considerations of *convenience*. PAE's argument isn't that Belgium is *inconvenient*, but rather that it will be substantively prejudiced by litigating there.

**IV.     Bill of Lading Clauses 3 and 15**

PAE, relying on the expert testimony of a Belgian lawyer, raises and emphasizes the possibility that a Belgian court will enforce the liability-limiting provisions of the bill of lading in a manner that violates COGSA. The Court doesn't share PAE's cynicism, for several reasons.

First, the bill of lading unambiguously provides that the liability of Cross Chartering and SSA is subject to the provisions of COGSA. It incorporates this provision, most likely, because COGSA doesn't apply by its own force to cargo carried on deck[6], but it "may be incorporated by contract to govern situations normally outside its scope." *North River Ins. Co. v. Fed Sea/Fed Pac Line*, 647 F.2d 985, 987 (9th Cir. 1981). *See also Columbia Machine, Inc. v. DFDS Transport (US), Inc.*, 2007 WL 5173280 at *5 (C.D. Cal. Oct. 4, 2007); *Deltamax Freight System v. M/V Aristotelis*, 1998 WL 1110395 at *4 (C.D. Cal. Dec. 7, 1998) ("Parties may contractually extend COGSA's provisions to "on deck" shipments."). The bill of lading explicitly says the Nordhavn will be carried on the Catalonia's deck with PAE's consent, and at PAE's risk, as to the perils inherent in that kind of carriage, but "in all other respects subject to the provisions of [COGSA] 1936."[7] Cross Chartering and SSA

---

[6] The manner in which COGSA defines the "goods" whose overseas shipments it regulates, cargo that is carried on the deck of a ship is excluded from the definition: "The term 'goods' includes goods, wares, merchandise, and articles of every kind whatsoever, except live animals and cargo which by the contract of carriage is stated as being carried on deck and is so carried." 46 U.S.C. § 30701, Note, § 1(c).

[7] There is no indication that Cross Chartering and SSA aim to escape COGSA's application by arguing that the dropping of a yacht by a stevedore's cranes is a risk that's inherent in on-deck carriage, even if it's not unheard of for these accidents to happen. *See Inst. of London Underwriters v. Sea-Land Svc., Inc.*, 881 F.2d 761 (9th Cir. 1989) (yacht dropped from slings while being unloaded from cargo ship); *Pan Am. World Airways, Inc. v. Cal. Stevedore & Ballast Co.*, 559 F.2d 1173 (9th Cir. 1977) (aircraft scissors lift dropped onto pier while being hoisted onto cargo ship); *St. Paul Travelers Ins. Co. v. M/V Madame Butterfly*, 700 F.Supp.2d 496 (S.D.N.Y. 2010) (yacht dropped when mobile crane offloading it from cargo ship tipped over). Rather, risks inherent in on-deck carriage are presumably those threatened by poor conditions at sea or exposure to ocean water and air. *See, e.g., Columbia Machine* at *2 (concrete-making machinery sustained rust damage during shipment to New Zealand); *Heli-Lift* at *1 (helicopter damaged because of seawater corrosion resulting from on-deck stowage); *MacSteel Int'l v. M/V IBN Abdoun*, 154 F.Supp.2d 826 (S.D.N.Y. 2001) (steel goods shipped from South Africa to United States ports sustained rust damage caused by seawater). Indeed, Cross Chartering concedes in its motion to dismiss that the language "at shipper's risk" only exonerates it from liability for "customary

evince every intention of litigating their dispute with PAE under COGSA, and under United States law. (*See* Mot. to Dismiss at 7–10.) In fact, they are willing to stipulate to this.[8] (Cross Chartering Reply Br. at 2; SSA Reply Br. at 6.)

PAE's reliance on *Heli-Lift*, *Majestic Electronics, Inc. v. M/V JIN HE*, 1999 WL 694186 (C.D. Cal. May 10, 1999), and *Nippon Fire & Marine Ins. Co. v. M/V Spring Wave*, 92 F.Supp.2d 574 (E.D. La. 2000), is misplaced. In each of those cases there was no reasonable doubt that the foreign forum's law would allow the defendants an outright escape hatch from COGSA's liability rules. In *Heli-Lift*, for example, the court refused to send a case to Germany because German law undoubtedly governed the bill of lading, and under German law a carrier can limit its liability for negligence. As the judge who decided *Heli-Lift* explained in a later case, "the cases holding forum selection clauses unenforceable on the ground that they reduce a carrier's obligations to a cargo owner below what COGSA guarantees deal with scenarios where application of foreign law entirely precludes a substantive right to recovery." *PAC Global* at *5. That's simply not a realistic concern here, considering that the bill of lading explicitly provides for the application of COGSA, and Cross Chartering and SSA are willing to stipulate to this.

PAE's fear that a Belgian court will ignore the plain language of the bill of lading is not reasonable. Its own expert admits that a Belgian court will adjudicate a contract dispute under the law chosen by the parties. (Marcon Decl. ¶ 4.) The Court also rejects PAE's argument — although it goes more to the resolution of the dispute than the question whether a Belgian court can fairly resolve it — that under *Columbia Machine* it is the Harter Act, not

---

and predictable risks of deck carriage," and not liability for negligence. (Mot. to Dismiss at 7 n. 3.)

[8] PAE argues that such a stipulation was rejected in *Majestic Electronics*, but that's a little misleading. No stipulation was actually offered in *Majestic Electronics*. Rather, the court indicated that if it were to treat *as a stipulation* a defendant's representation in a brief that it would not invoke a liability-limiting provision of a bill of lading, it would still have some doubt that a foreign (Chinese) court would honor the stipulation. Here, Cross Chartering's expert on Belgian law testifies that a Belgian court "will enforce the stipulation of a party as to the applicable law to govern a dispute . . . ." (Wijffels Supplemental Decl. ¶ 16.) This makes perfect sense given that the stipulation merely reinforces what the bill of lading already provides, namely that the liability of Cross Chartering and SSA for risks not inherent to on-deck carriage shall be governed by COGSA.

COGSA, that applies to the bill of lading. The bill of lading at issue in *Columbia Machine*, unlike the bill of lading at issue here, contained no express provision that COGSA would govern the liability of the carrier for cargo carried on deck. It provided that the cargo would be "loaded on deck at cargo owner's risk," and *Columbia Machine* stands for the modest holding that absent some stipulation that COGSA applies to cargo carried on deck, liability limitations that are conditional on COGSA's application have no force. *Columbia Machine* at *9.

Second, the testimony of PAE's expert, Peter Marcon, is simply unconvincing. Mr. Marcon concedes, at the outset, that a Belgian court should honor the bill of lading's specification that COGSA will govern the liability of Cross Chartering and SSA: "A contract shall be governed by the law chosen by the parties." (Marcon Decl. ¶ 4.) He also concedes that the bill of lading's incorporation of COGSA "will rather be interpreted by a Belgian Court as the contractual election of the legal provisions that shall govern the carrier's liability for all other risks and perils than those inherent in carriage of goods on deck." (Marcon Decl. ¶ 5.) But then he backpedals, and maintains that even though Belgian law allows parties to a contract to elect the governing law, and even though the bill of lading provides that COGSA will govern the liability of Cross Chartering and SSA, a Belgian court will be reticent to enforce COGSA, and *may* enforce the liability-limiting provisions of the bill of lading that PAE argues are at odds with the spirit of COGSA:

> I *cannot exclude* that . . . a Belgian court *could apply* clause 3, a) last sentence of the reverse side of the B/L by virtue of which the carrier shall in no case be responsible for loss or damage to cargo (...) with respect to deck cargo. This *could result* into the carrier being not liable at all.

(Marcon Decl. ¶5 (emphasis added).) His explanation, in a nutshell, is that Belgian courts have limited experience applying foreign law, and in the event it proves indecipherable to them, they will apply Belgian law as a default, or just take the easy way out and enforce the plain terms of the bill of lading:

> If foreign law applies, e.g. US COGSA, article 15 § 1 Code Private International Law provides that the contents of the determined foreign law shall be established by the judge . . . .

> However, in case it is impossible to determine the contents of the applicable foreign law, article 15 §, last sentence says that Belgian law shall then apply.
>
> Although from a theoretical point of view a Belgian court can apply foreign law, it is our experience that due to lack of experience with foreign law and the often rather general nature of legal opinions from foreign expert lawyers due to which the subtleties of the relevant foreign law may escape from the Belgian judges' attention, it is our personal experience that Belgian courts often try to avoid to solve the case on the basis of the applicable foreign law if the legal issues to be considered are too complex.  We mention this personal experience only to emphasize that, although Belgian courts seized with a case governed by foreign law, are obliged to apply such foreign law, there is a substantial risk that such foreign law is not applied in the same manner as a court of the State whose is applied, would do.

(Marcon Decl. ¶ 6.)

This is all too conjectural for this Court to retain jurisdiction over this case, especially considering that Mr. Marcon does not speak to the facts of *this particular case*, and also considering that the question is not whether a Belgian court will enforce United States law but whether Belgian law will reduce the obligations of Cross Chartering and SSA below what COGSA requires.  *See Pac Global* at *5 ("[W]hile real differences may exist in the way that American and Chinese courts might interpret the law in the instant action, those differences do not alter Defendants' substantive obligations."); *Fireman's Fund*, 131 F.3d at 1339.  On this latter point, Marcon does explain that under Belgian law a "party to a contract can limit/restrict its liability to a large extent" but he doesn't spell out how these limits or restrictions are ones COGSA would not countenance.[9]  Nor does PAE spell that out in a convincing way.

It would be another matter entirely if Mr. Marcon could show, in no uncertain terms, that a Belgian court would be either categorically opposed to enforcing COGSA, or inclined

---

[9] Under Belgian law, according to Mr. Marcon, a party cannot limit its liability for fraud or willful misconduct, nor can it "make the obligations of that party meaningless." (Marcon Decl. ¶ 7.)  Arguably, though, if a carrier like Cross Chartering can limit its liability for negligence and fault — which COGSA proscribes — it can come quite close to rendering its obligations meaningless.  The Court simply isn't persuaded, then, based on Mr. Marcon's vague account of Belgian law, that Belgian law is substantively and meaningfully different from United States law and COGSA.

to enforce Belgian law in a manner that is clearly offensive to the spirit of COGSA. But all Mr. Marcon does, really, is invoke the mere possibility that a Belgian court would struggle to understand and enforce COGSA, or else enforce Belgian law in manner that might trample on PAE's protections under COGSA.[10] This manner of questioning the competence of a foreign court is insufficient to invalidate a forum clause that would send a case to that court. *See Vimar Seguros*, 515 U.S. at 537 ("Petitioner's skepticism over the ability of foreign arbitrators to apply COGSA . . . must give way to contemporary principles of international comity and commercial practice.").

Third, the premise of PAE's opposition to the motion to dismiss is that clauses (3) and (15) in the bill of lading, which it contends a Belgian court *may* enforce, are invalid under COGSA, or will reduce the liability of Cross Chartering and SSA below COGSA's guarantees. That's not obvious. It's telling that Cross Chartering won't explicitly make this concession, resorting instead to the cagey position that a Belgian court will not enforce the clauses if they are unenforceable under United States law. (*See* Cross Chartering Reply Br. at 2 ("As Mr. Wijffels points out, the parties will have no problem whatsoever in establishing that Clause 3(a) is not enforceable if the statutory and case law is provided."); Cross Chartering Reply Br. at 9 ("According to Mr. Wijffels, Plaintiffs will be able to pursue their tort claim against SSA to the extent it is permitted under U.S. law.").) If these liability-limiting provisions in the bill of lading may retain some force even under United States law, it's no argument at all that a Belgian court can't be trusted to adjudicate the parties' dispute because *it* will enforce those provisions.[11] SSA goes one step further, arguing that "United

---

[10] Truth be told, this Court hadn't heard of COGSA, and didn't even know what a bill of lading or stevedore was, before receiving this case. It just spent time reading the cases submitted by the parties to gain an understanding of the facts and issues that this case presents. There is no reason to believe that a Belgian court can't do the same.

[11] Although Cross Chartering doesn't make the argument, as far as the Court can tell, PAE will have to deal with *London Underwriters*, which holds that when COGSA is incorporated into a contract to which it would not apply by its own force, "terms inconsistent with COGSA, but which are otherwise valid contract terms, may be given force . . . ." 881 F.2d at 766. But nevertheless, Cross Chartering concedes that "the carrier remains responsible for damage resulting from negligence in the care of the cargo . . . ." (Mot. to Dismiss at 7, n. 3.) It may be that Cross Chartering doesn't really care if it can enforce

States courts routinely enforce clause 15(a) to bar claims for negligence against the stevedore or other agent of the carrier." (SSA Reply Br. at 7.) That argument is far from frivolous. In *St. Paul*, the district court enforced a bill of lading provision prohibiting suits against a stevedore — even for *negligence* — even though the bill of lading specified that COGSA was the governing law.[12] 700 F.Supp.2d at 505. This is seriously detrimental to PAE's argument that the forum clause is unenforceable because it couldn't assert a claim against SSA in Belgium but *could* assert a claim in the United States. (Opp'n Br. at 15.)

## V.  Fair Opportunity Doctrine

COGSA provides that liability for lost or damaged cargo shall not exceed $500 unless the value of that cargo is declared in a bill of lading:

> Neither the carrier nor the shipper shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States . . . unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

46 U.S.C. § 30701, Note, § 4(8). Under Ninth Circuit law, a carrier may take advantage of this liability limit "only if the shipper is given a 'fair opportunity' to opt for a higher liability by paying a correspondingly greater charge." *Carmen Tool & Abrasives, Inc. v. Evergreen Lines*, 871 F.2d 897, 899 (9th Cir. 1989). *See also Tessler Bros. (B.C.) Ltd. v. Italpacific Line*, 494 F.2d 438, 443 (9th Cir. 1974) ("A significant restriction on a carrier's right to limit liability to an amount less than the actual loss sustained is that the carrier must give the shipper 'a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge.'") (quoting *New York, New Haven & Hartford Railroad Co. v. Nothnagle*, 346 U.S. 128, 135 (1953)). The Nordhavn's declared value on

---

clause 3(a) in the bill of lading, because it believes its liability is limited, anyway, to $500 given that PAE didn't declare a higher value for the Nordhavn. The difference between no payment and a $500 payment is probably trivial as far as Cross Chartering is concerned.

[12] There was no discussion in *St. Paul* as to whether allowing for a stevedore to be shielded entirely from liability constitutes a violation of COGSA, which PAE seems to suggest, but COGSA's limitation on liability for negligence, on its face, applies only to carriers. *See* 46 U.S.C. § 30701, Note, § 3(8) ("Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods . . . shall be null and void and of no effect.").

the bill of lading is "None." This has the effect of limiting Cross Chartering and SSA's liability to $500 under COGSA *unless* PAE can show it was deprived of a fair opportunity to declare a higher value.

PAE argues that Belgian courts have no "fair opportunity" doctrine and won't be receptive to their argument. (*See* Marcon Decl. ¶ 9.) That argument, roughly, is that it's the carrier's burden to provide fair opportunity, and that Cross Chartering failed to satisfy even its minimal obligation to warn PAE in the bill of lading that declaring the Nordhavn to be of no value would limit Cross Chartering's liability to $500. *See Komatsu, Ltd. v. States S.S. Co.*, 674 F.2d 806, 809 (9th Cir. 1982) ("Express recitation in a bill of lading of the language contained in COGSA § 4(5) is prima facie evidence that the carrier gave the shipper [fair] opportunity and places the burden on the shipper to prove that such an opportunity did not exist in fact."). To be clear, the question here — despite the focus the parties give the issue in their briefs — is not whether PAE actually had a "fair opportunity" to declare a higher value for the Nordhavn, but whether they will have the opportunity to make that argument in a Belgian court.

The Court again finds PAE's skepticism about its fate in a Belgian court to be unreasonable. PAE relies heavily on the testimony of Mr. Marcon:

> It is under Belgian law not a condition precedent to enforcement of any limitation clause in an ocean bill of lading that it contains a stated notice of limitation and an opportunity to declare a higher value and to pay a higher freight in order to avoid the limitation.

(Marcon Decl. ¶ 9.) Setting aside the point that Belgium needn't have law that is analogous to the that of the United States in order for transfer to be appropriate, Cross Chartering and SSA agree that the law of the United States governs their dispute with PAE, and they are willing to enter a stipulation to this effect. As their briefing makes clear, they are ready and willing to argue that PAE received a fair opportunity to declare a higher value for the Nordhavn, and there is not the slightest hint that they intend to arrive in a Belgian court and make the argument that the fair opportunity doctrine, or some equivalent of it, does not apply to them under Belgian law in the first instance. There is no reason to doubt the ability of a

Belgian court to familiarize itself with the fair opportunity doctrine and apply it as the case law, which the parties will ably provide and summarize, dictates.

## VI. Conclusion

Cross Chartering and SSA agree that United States law, particularly COGSA and the fair opportunity doctrine, governs their liability for the mishandling and loss of the Nordhavn. For its part, PAE stands behind the conjectural testimony of Mr. Marcon that a Belgian court *may* struggle to understand and apply United States law. Returning to first principles, forum selection clauses in admiralty cases are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances." *M/S Bremen*, 407 U.S. at 10 (internal quotations omitted). The question in this case is not whether a Belgian court will apply United States law, or whether PAE can obtain the exact relief it seeks under Belgian law, but whether PAE can walk into a Belgian court and advance, with some meaningful hope of success, the same claims and arguments it would advance in this Court. *See Vimar Seguros*, 515 U.S. at 540 ("Were there no subsequent opportunity for review and were we persuaded that 'the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies . . ., we should have little hesitation in condemning the agreement as against public policy.'") (quoting *Mitsubishi Motors*, 473 U.S. at 637, n. 19). The Court sees no reason not to answer that question in the affirmative. Cross Chartering and SSA's motion to dismiss PAE's complaint pursuant to the forum clause in the bill of lading is therefore **GRANTED**.

**IT IS SO ORDERED**.

DATED: April 19, 2011

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge